## HOOPER et al. v. UNITED STATES.

(Circuit Court of Appeals, Eighth Circuit.
May 10, 1926.)

No. 7086.

1. **Adoption ⬅17—Plaintiffs held not to have shown validity of nunc pro tunc order for entry of unsigned order of adoption (War Risk Insurance Act Sept. 2, 1914 [38 Stat. 711], as amended by Act Oct. 6, 1917 [40 Stat. 409], and Act Dec. 24, 1919 [41 Stat. 371]; Comp. St. Ann. Supp. 1923, § 514mmm).**

In action on war risk insurance policy, plaintiffs claiming under War Risk Insurance Act Sept. 2, 1914, as amended by Act Oct. 6, 1917, and Act Dec. 24, 1919 (Comp. St. Ann. Supp. 1923, § 514mmm), and seeking to establish adoption of deceased soldier by nunc pro tunc order directing entry of order of adoption, not signed or entered at time of its alleged making, *held* not to have shown such nunc pro tunc order was based on sufficient evidence, even if such order could be based on parol evidence.

2. **Army and navy ☞51½, New, vol. 12A Key-No. Series—Claimants of proceeds of war risk insurance policy held to have burden of sustaining nunc pro tunc order directing entry of order of adoption of deceased soldier (War Risk Insurance Act Sept. 2, 1914 [38 Stat. 711], as amended by Act Oct. 6, 1917 [40 Stat. 409], and Act Dec. 24, 1919 [41 Stat. 371]; Comp. St. Ann. Supp. 1923, § 514mmm).**

Plaintiffs, claiming proceeds of war risk insurance policy under War Risk Insurance Act Sept. 2, 1914, as amended by Act Oct. 6, 1917 and Act Dec. 24, 1919 (Comp. St. Ann. Supp. 1923, § 514mmm), *held* to have burden of sustaining a nunc pro tunc order directing entry of order of adoption of deceased soldier by competent and sufficient proof.

3. **Motions ☞54.**

A nunc pro tunc order must find support in some entry or memorandum of record, or in authentic files of cause, and cannot rest entirely on parol evidence.

4. **Army and navy ☞51½, New, vol. 12A Key-No. Series—Claimants of proceeds of war risk insurance policy as adoptive parents of deceased soldier held not entitled, when proceedings did not comply with laws of state of residence at time of death (War Risk Insurance Act Sept. 2, 1914 [38 Stat. 711], as amended by Act Oct. 6, 1917 [40 Stat. 409], and Act Dec. 24, 1919 [41 Stat. 371]; Comp. St. Ann. Supp. 1923, § 514mmm; Laws Mo. 1917, p. 194).**

Plaintiffs, adopting child under laws of Arkansas, differing materially from those of Missouri, where child resided at time of death, *held* not entitled to proceeds of war risk insurance policy under War Risk Insurance Act Sept. 2, 1914, as amended by Act Oct. 6, 1917, and Act Dec. 24, 1919 (Comp. St. Ann. Supp. 1923, § 514mmm), in view of Laws Mo. 1917, p. 194, giving adoptive parents right to inherit from adopted child only when adoption proceedings are in accordance therewith.

In Error to the District Court of the United States for the Eastern District of Arkansas; Jacob Trieber, Judge.

Action by Austin L. Hooper and another against the United States, wherein J. J. Davis and others intervened. Judgment for the United States, and plaintiffs bring error. Affirmed.

J. A. Tellier and A. L. Barber, both of Little Rock, Ark. (Rogers, Barber & Henry, of Little Rock, Ark., on the brief), for plaintiffs in error.

Ira J. Mack, Asst. U. S. Atty., of Newport, Ark. (James T. Brady, Atty. U. S. Veterans' Bureau, of Washington, D. C., on the brief), for the United States.

Before LEWIS, Circuit Judge, and MUNGER and JOHNSON, District Judges.

LEWIS, Circuit Judge. Austin L. Hooper and wife, plaintiffs in error, brought this action to recover from defendant in error the amount named in a War Risk Insurance certificate which had been issued to Nathan Nobles on September 12, 1918. Nobles was inducted into the service from his place of residence in the State of Missouri on September 6, 1918, having attained the age of 21 years on the 12th of the preceding month and died of influenza at Camp Merritt, New Jersey, on December 8, 1918, while he was in the military service of the United States. It is alleged in the complaint that Austin L. Hooper procured an order in the Probate Court of White County, Arkansas, on October 9, 1909, legally adopting Nathan Nobles, then twelve years of age, as his son, that his father and mother were then dead and since that time all of his blood relations have died, that the boy lived with plaintiffs in error from some time in the year 1908 until September, 1915, when he went to Missouri, that on two occasions, one in 1915 and one in 1916, he returned to plaintiffs in Arkansas for a while, then went back to Missouri in the Spring of 1917, and plaintiffs thereafter never saw him. The answer admits the allegations of the complaint as to Nobles being inducted into the military service, and that he applied for and there was granted to him War Risk Insurance in the sum of $10,000, and that he caused himself to be named as beneficiary in the certificate. It denied that Nobles had been legally adopted by Hooper. One J. J. Davis was permitted to intervene as claimant. He alleged that he was the true and lawful father of the deceased, that he had always recognized the deceased as his son and that he was entitled to recover the amount named in the certificate. These allegations were denied in the answer. Arch and Myrtle Pollard, residents of Pemiscot County, Missouri, were also permitted to intervene as claimants. They alleged that for more than one year prior to Nobles' induction into the military service they stood in the relation of loco parentis to him, that at the request of Nobles they took him into their home when he was homeless, sick and destitute, and cared for him until he went into the service on September 6th. They further alleged that Nobles died testate and that they were his legatees. These allegations were put in issue.

A jury was waived, the case went to trial on March 3, 1925, the court found, as alleged, that Nobles was enlisted in the military service on September 6, 1918, that on September

12, 1918, he applied for and was granted War Risk Insurance to the amount of $10,-000, pursuant to the Act of Congress approved October 6, 1917 (40 Stat. 398), that he designated himself as beneficiary, that he died on December 8, 1918, when the certificate of insurance was in full force and effect, that he was a resident of the State of Missouri and that the plaintiff, Hooper, was not his adoptive parent. It was further found that the claimed order of adoption was a nunc pro tunc order, not made in open court and without hearing any evidence, and that it was undisputed that the order was not entered, and the Judge who signed it never saw it, until years after the boy sought to be adopted was dead, that the Pollards stood in loco parentis to the insured for more than one year prior to his entry into the military service, that they were not legatees; and it concluded that neither the plaintiffs nor the Pollards were entitled to recover. Davis did not appear, at the trial. Judgment was entered in favor of the United States and the Hoopers brought the case here.

The War Risk Insurance Act, 38 Stat. 711, as amended by 40 Stat. 398, as amended by 41 Stat. 371, designates the beneficiary in case of a soldier's death. The relative parts read thus:

"The term 'parent' includes a father, mother, grandfather, grandmother, * * * stepfather, and stepmother, either of the person in the service or of the spouse" (40 Stat. 401 [Comp. St. § 514mmm]); "the insurance shall be payable only to a spouse, child, grandchild, parent, brother, or sister" (40 Stat. 409 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 514uuu]); "the terms 'father' and 'mother' include stepfathers and stepmothers, fathers and mothers through adoption, and persons who have stood in loco parentis to a member of the military or naval forces at any time prior to his enlistment or induction for a period of not less than one year" (41 Stat. 371 [Comp. St. Ann. Supp. 1923, § 514mmm]); "if no beneficiary within the permitted class be designated by the insured, either in his lifetime or by his last will and testament, or if the designated beneficiary does not survive the insured, the insurance shall be payable to such person or persons within the permitted class of beneficiaries as would under the laws of the State of the residence of the insured be entitled to his personal property in case of intestacy" .(40 Stat. 410 [Comp. St. 1918, Comp. St. Ann. Supp. 1919, § 514uuu]).

[1] When the trial opened plaintiffs in error first offered in evidence a certified copy of what they claimed to be the order of adoption of the Probate Court of White County, Arkansas, designated as Exhibit B. It reads thus:

"In the Matter of the Adoption of Nathan Noble.

"On this day is presented to the Court the petition of A. L. Hooper duly verified for the adoption of Nathan Noble, residing at Pangburn, Arkansas, in White County, Arkansas, of ——— years. And also appeared A. L. Hooper in person, and states upon oath that the father and mother of the said Nathan Noble are dead.

"And it appearing to the satisfaction of the Court that it will be for the best interest of the said Nathan Noble that he be adopted by the said A. L. Hooper, and it appearing that the mother and father of the said Nathan Noble are dead, it is therefore ordered by the Court that the said A. L. Hooper become, and he is hereby authorized to adopt the said Nathan Noble who shall henceforward take the name of Hooper, and shall be entitled to and shall receive all the rights and interest in the estate of the said A. L. Hooper, by descent or otherwise, that he would have if the natural heir of the said A. L. Hooper and the said A. L. Hooper shall be liable for the maintenance and education and in every other way responsible as the natural father of the said Nathan Noble. It is further ordered that the petitioner shall pay all cost herein.

"Given under my hand in open court as County and Probate Judge, of White County, this ——— day of October term, 1909.
"R. W. Chrisp, Probate Judge.

"Now on this day is presented the above and foregoing order of adoption of Nathan Noble, and it appearing that said order of adoption was duly made by R. W. Chrisp, County and Probate, but that same was not entered on the Probate records. Therefore said order is now ordered placed of record now for then, or Nunc Pro Tunc. Given under my hand this 8th day of Aug., 1921.
"F. O. White, County and Probate Judge."

This was objected to. Thereupon this occurred:

"Mr. Tellier: We are prepared to show the nunc pro tunc order is based on sufficient evidence, namely: an order unsigned found properly in the custody of the Court; and we have witnesses here who heard the order made; the counsel, Eugene Cypert was coun-

sel for plaintiff is here, and when the order was made, and the plaintiff Hooper is here, who was present when the order was made. For some reason unknown to us the order was not signed when made, but remained in the files and was found in its proper place in 1921.

"The Court: But never entered?

"Mr. Tellier: Never was entered.

"The Court: The objection will be sustained.

"Mr. Tellier: Let the record show that we offered to prove by extrinsic evidence and parol evidence that the court in fact made the order of adoption which is offered in evidence, as Plaintiff's Exhibit B, and plaintiff saves exceptions to the ruling of the Court.

"The Court: Now wait a minute, this appears to have been signed by the Probate Judge.

"Mr. Tellier: Yes, your honor, but it was signed at the time the nunc pro tunc order was made. It was taken out in the country to the former probate judge's home. I treat that signature as surplusage; he wasn't in office but his term had expired."

L. T. Bell then testified. He was then and had been clerk of the probate court in White County for something over two years prior to the date of trial. He did not occupy that position in 1921. He was interrogated and testified as follows:

"Q. Mr. Bell, did you find the original order of adoption in the files regularly, if so at what time? A. Yes, sir, at the time— I forget the exact date, but somewhere near the 18th of February.

"Q. What year? A. 1921.

"Q. State the circumstances; how you came to find this order of court. A. I was asked to make the search, to make the certified copy of the original order as it appeared in the file, if in the office.

"Q. Have you the original unsigned order that you found in the files of the clerk? A. We have the original order, but it appears to be signed at the time I found it.

"Q. I show you a paper, and will you state what that is? A. That is the original order, signed at the time I found it; in the proper files.

"Mr. Tellier: Well, the explanation is as I stated a few minutes ago; it was conceived that the County Judge after term could sign the order; it was unsigned and left in the files, and so it was taken to the county judge who had gone out of office, and that explains the reason why it was signed. We will make proof of that shortly."

The questions and answers referring to

the paper signed by R. W. Chrisp as having been found in the files in the clerk's office are misleading. Bell testified that no petition in the claimed adoption proceedings had been or could be found in the clerk's office. Following the preceding the court said:

"Let the record show now that it is admitted by plaintiff that the order wasn't signed by the judge and was not entered of record until 1921, after the death of the soldier and assured, and after the expiration of the term of the judge who signed it, that he had been out of office a number of years, and he was not judge at the time he signed it."

Then the plaintiff proceeded to prove that A. L. Hooper filed a petition in the probate court of White County on April 28, 1909, praying that he be appointed guardian for Nathan Nobles. That petition was offered in evidence. It was therein stated that Nathan Nobles was then 13 years old. Pursuant to that petition R. W. Chrisp signed an order as probate judge removing one Jack Davis as guardian of the said minor and appointed A. L. Hooper as such in his stead, on condition that he give bond in the sum of $150.00. That order was offered in evidence, and Hooper's bond given in compliance with that order was offered in evidence. Plaintiff then called Eugene Cypert, who testified that he was a practicing attorney at Searcy, Arkansas, that he acted for Austin L. Hooper in the adoption of Nathan Nobles, that he filed a petition for that purpose for Mr. Hooper, that he drew the claimed order of adoption signed by R. W. Chrisp on his typewriter "at the time the order was made, or about the time," that he did not know why the judge did not sign it, that it was not placed of record but that the judge made the order of adoption in open court, that he did not know where the purported adoption order was found, that it was shown to him about 1921, that it was not signed at all until about two or more years ago. He was asked:

"Q. Did you show this order to Judge Chrisp in 1921? A. I don't remember that I did.

"Q. In 1921, do you recall having given to Judge Chrisp that, having gone to Judge Chrisp with Mr. Hooper, and at that time Mr. Chrisp signing the order? A. He signed it at that time, but I don't know whether I was present at the time he signed it."

He further testified that when he drew the order he gave it to the probate clerk. He did not state who was clerk.

L. T. Bell was recalled. He testified that the proceedings for the appointment of Hooper as guardian were spread upon the records of the court, but there was nothing on the records concerning the adoption of Nathan Nobles, other than the nunc pro tunc order. While Bell was on the stand this occurred:

"The Court: Is there anything to show there was a hearing before the nunc pro tunc order was entered? Of course it was a different judge. He couldn't pass on it without a hearing.

"Mr. Tellier: I think the jurisdiction of the court will be presumed; we have already shown that there was in existence an order."

The witness was then asked this question:

"Q. I show you Exhibit B in regard to the adoption proceedings of Nathan Nobles. Was there anything of record in your office, or is there anything in the files in your office, other than what appears in this certified copy? A. There is not, so far as I have been able to find."

Hooper testified that he took the boy down and talked to the judge about having him adopted, that he had Cypert as his attorney and went before Judge Chrisp and had him adopted, and the judge told him the boy was his. This is all of the testimony, in substance, relating to the order which Mr. Cypert said he drew in 1909 and which R. W. Chrisp, then probate judge, did not sign until 1921, long after he had gone out of office.

The purpose of adoption proceedings in October, 1909, does not appear. Only in the preceding April Hooper had succeeded in having Davis removed as the boy's guardian because, as he claims, Davis was mistreating the boy, and himself appointed in his stead. No explanation is given as to why Hooper, within six months, changed his mind and preferred adoption rather than guardianship. No petition was with the order when Bell found it in February, 1921, in the clerk's office, then already signed. He was asked:

"State the circumstances; how you came to find this order of court.

"A. I was asked to make the search, to make the certified copy of the original order as it appeared in the file, if in the office."

Bell was not then clerk of the court. He did not say who asked him to make the search, but whoever asked him told him to make a certified copy of it, if it was in the office. Cypert says he left it with the clerk when he drew it in 1909. It is assumed that it remained there until taken out for the sig-

nature of Chrisp, but the record fails to show who took it out, when it was taken out, how it happened to be taken out, who returned it and when it was returned. This, apparently from counsel's admission, was all done after Nobles' death.

The examination of one other witness must be noted. Mr. Blount, an attorney, was asked this question:

"There has been introduced in evidence a nunc pro tunc order showing the adoption of Nathan Nobles. Were you present when the order was made by the court? A. I was.

"Q. Tell this court what took place, and on what evidence the nunc pro tunc order was made.

"Mr. Mack: We understood the court sustained an objection to the nunc pro tunc order.

"Mr. Tellier: We offer to show by this witness that he was present when the nunc pro tunc order was made, which has been introduced in evidence, and there was presented to the then probate judge a memorandum in writing showing the order as made, as of the date when it was made, at the October term, 1909, and that evidence was before the probate judge when the nunc pro tunc order was made and the hearing was had upon this evidence, and in pursuance of this evidence the nunc pro tunc order was made.

"The Court: Which was no evidence."

Counsel for plaintiffs in error in their brief say:

"In making this nunc pro tunc order the probate judge had sufficient evidence upon which to base it, not only the original order that had reposed in the files unsigned for 12 years, but there was a hearing before the court on August 8, 1921, and other evidence introduced, upon which the probate judge made the order nunc pro tunc. This the plaintiff offered to prove by the witness, Blount, but his testimony on this point was excluded by the trial court, to which ruling of the court the plaintiff saved his exceptions."

We do not find in the record any ruling whatever by the court on counsel's offer when witness Blount was upon the stand, nor does the record show any objection or exception in that regard. Furthermore, we do not think that offer, or any other part of the record, discloses a request, purpose or desire on the part of counsel to offer oral testimony for the purpose of establishing that any proof, other than the so-called order as signed by R. W. Chrisp, was presented to and considered by Judge White when he un-

dertook to make the order of August 8, 1921. If such purpose and intention was in the mind of counsel, the record fails to show that it was disclosed to the court on the trial of this case. Take counsel's first statement on that subject:

"We are prepared to show the nunc pro tunc order is based on sufficient evidence, namely: an order unsigned found properly in the custody of the Court; and we have witnesses here who heard the order made; the counsel, Eugene Cypert was counsel for plaintiff is here, and when the order was made, and the plaintiff Hooper is here, who was present when the order was made. For some reason unknown to us the order was not signed when made, but remained in the files and was found in its proper place in 1921."

When the witness Bell was on the stand the court said:

"Is there anything to show there was a hearing before the nunc pro tunc order was entered? Of course it was a different judge. He couldn't pass on it without a hearing."

This inquiry is the only clear reference by anyone to what may have occurred, or may not have occurred when Judge White signed the order of August 8, 1921. The court's remark was notice and invitation to show the competent and relevant facts presented to Judge White at that time. The response made by counsel was this:

"Mr. Tellier: I think the jurisdiction of the court will be presumed; we have already shown that there was in existence an order." [2, 3] Take the offer when Mr. Blount was on the witness stand. It was an offer to show that when the nunc pro tunc order was made there was presented to Judge White, who made it, a memorandum in writing showing the order as made, as of the date when it was made, at the October term, 1909. That was undoubtedly the purported order which R. W. Chrisp had signed, and Judge White, in his order refers to it and states that he makes the nunc pro tunc order on the order of R. W. Chrisp. The offer is not to show that other evidence than the so-called memorandum in writing, signed by Chrisp, was before Judge White. "That evidence," and "this evidence," in the offer, must have been taken to mean the purported order or "memorandum in writing" signed by R. W. Chrisp. At least it could not have conveyed to the mind of the trial judge, as we view it, any other meaning; especially so in the light of what had gone before, and it is a most remarkable and unexplained fact that after Chrisp had put his signature on the so-called

order, some time in 1921, it then got back into the clerk's office, no one stated just how, or at least no one gave information on the subject, and remained there until August 8, 1921, when Probate Judge White made his nunc pro tunc order. Strange and unexplained movements of an inert body! For L. T. Bell testifies that on February 18, 1921, he found this order, having been requested by someone to search for it, and that it had been signed by Chrisp when he found it. Chrisp did not testify. The record does not disclose who submitted the paper signed by R. W. Chrisp to Probate Judge White. It was not the duty of the trial court to make inquiry as to whether or not there were sufficient facts that might have been presented to Judge White sustaining his action. When it appeared by admission early in the trial that R. W. Chrisp's signature to the so-called order was not judicial but was made long after he had gone out of office, the burden was then upon plaintiffs to sustain the nunc pro tunc order by competent and sufficient proof; and the court below found that sufficient proof had not been submitted to Judge White. The purpose and function of an order nunc pro tunc is to make and supply an omitted record of judicial action taken at a previous term; and the great weight of authority sustains the rule that the order must find support in some entry or memorandum of record, or authentic files in the cause, and cannot rest entirely on parol evidence. It is said in 1 Black on Judgments, § 135:

"The great balance of authority seems to be with the cases holding that so far as concerns the question whether a judgment was ever rendered, that fact must be established by record evidence and cannot be proved by parol."

The same in Freeman on Judgments (4th Ed.) § 61:

"Probably the weight of authority sustains the rule that only by some entry or memorandum on or among the records of the court can the rendition of a judgment be proved."

23 Cyc. 845, says:

"According to the generally accepted rule the evidence to justify the entry of a judgment nunc pro tunc must be record evidence, that is, some entry, note or memorandum from the records or quasi-records of the court, which shows in itself, without the aid of parol evidence, that the alleged judgment was rendered and what were its character and terms."

In Belkin v. Rhodes, 76 Mo. 643, 650, 651, the court said:

"Unless the facts do in some way appear by the record, or some entry or paper in the cause, nunc pro tunc entries are not allowable. They cannot be made from outside evidence or from facts existing alone in the breast of the court, at a subsequent term. * * * But in all cases, when nunc pro tunc entries are made the record should in some way show, either from the judge's minutes, the clerk's entries or otherwise, the facts which would authorize the entry. Such entries cannot be made from outside evidence, or from facts existing alone in the breast of the court, after the term at which the judgment was rendered."

The Supreme Court of Arkansas, in Bobo v. State, 40 Ark. 224, seems to hold to the contrary and to permit a nunc pro tunc order on proof in parol. But we think it would be a hazardous procedure, dangerous to the rights of interested parties, to permit the application of that rule after the lapse of twelve years. The memory of witnesses may become dimmed in that time, and testimony of others who had equal opportunity to know the facts may not be obtainable, on account of death or for other cause; nor is it shown that the United States had notice of the proceeding before Judge White. However, the proof did not make out plaintiffs' case, if the more liberal rule be applied.

[4] The War Risk Insurance Act provides, as noted above (40 Stat. 410), that if no beneficiary within the permitted class be designated by the insured, either in his lifetime or by his last will and testament, then the insurance shall be payable to such person or persons within the permitted class of beneficiaries as would, under the laws of the State of the residence of insured, be entitled to his personal property in case of intestacy. The court found, on sufficient proof, that at the time of insured's death he was a resident of the State of Missouri. Plaintiffs, for the purpose of showing that they were entitled to inherit the personal property of the insured, quote in their brief a section of the Missouri statute relating to that subject, which provides for the adoption of children. It reads:

"When a child is adopted in accordance with the provisions of this article, all legal relationship, and all rights and duties, between such child and its natural parents shall cease and determine. Said child shall thereafter be deemed and held to be for every purpose, the child of its parent or parents by adoption, as fully as though born to them in lawful wedlock. Said child shall be entitled to proper support, nurture and care from said parents by adoption, and shall be capable of inheriting from them, and as the child of said parents as fully as though born to them in lawful wedlock. Said parent or parents by adoption shall be entitled to the service, wages, control, custody and company of said adopted child, and shall be capable of inheriting from, and as the parents of, said adopted child as fully as though the child had been born to them in lawful wedlock: Provided, however, that neither said adopted child nor said parents by adoption shall be capable of inheriting from or taking through each other property expressly limited to heirs of the body of such child or parent by adoption." Laws 1917, p. 194.

This is a part of the Act of the Legislature of that State approved April 10, 1917, which repealed a prior Act on the subject and made entirely new provision in the method of the adoption of children. It provides that petition for adoption shall be filed in the Circuit Court of the County in which the person sought to be adopted resides, that the petition shall state the name, sex and age of the child sought to be adopted, and if a change of his name was desired it shall be so stated and the new name given, that it shall set forth the facts showing petitioner's ability to properly care for, maintain and educate the child. It further provides that the court shall not decree the adoption where the child or person to be adopted is under the age of 21 years, unless the parents, or surviving parent or guardian of the child, if any, consent in writing to the adoption, and unless the child, if of the age of 12 years or over, consent in writing to the adoption. It requires that the court shall appoint a guardian ad litem to represent the child in said proceedings and that if the court, after due hearing, is satisfied that the person or persons petitioning to adopt the child are of good character and of sufficient ability to properly care for, maintain and educate said child, that the welfare of the child will be promoted by sustaining the petition for adoption, and that it is fit and proper that such adoption should be made, that then a decree shall be made setting forth the facts and ordering that from the date of the decree the child shall to all legal intents and purposes be the child of petitioner or petitioners, and the court may decree that the name of the child be changed according to the prayer of the petition. The statute of Arkansas makes entirely different provisions

for the adoption of children. It provides that the person desiring to adopt any child may file his petition therefor in the probate court in the county where such child resides, that such petition shall specify the name of the petitioner, the name of the child, its age, whether it has any property and if so how much, and whether such child has either father or mother living and if so, where they reside. The petition shall be verified by the petitioner. It further provides that when the probate court is satisfied that it will be for the interest of the child, it shall make an order that such child be adopted, and from and after the adoption of such child it shall take the name in which it is adopted and shall be entitled to and receive all the rights and interests in the estate of such adopted father or mother, by descent or otherwise, as such child would if the natural heir of such adopted father or mother. The Arkansas statute, however, does not provide that the adoptive father or mother shall inherit from the child. The material difference between the two statutes is that the Missouri statute requires, and the Arkansas does not, that the court shall appoint a guardian ad litem to represent the child in the proceedings, that where the child is of the age of 12 years or over it must consent in writing to the adoption, and that consent in writing, if the child be under the age of 21 years, shall be given by the parents, or surviving parent or guardian, and that the facts which the petition is required to set forth shall be set forth in the decree of adoption.

The complaint in the court below alleges that Nathan Nobles reached his majority on August 12, 1918. He was, therefore, over the age of 12 years in October, 1909, when, it is claimed, Probate Judge Chrisp heard the petition of A. L. Hooper for the adoption, and it does not appear that Nathan Nobles gave his consent in writing to the adoption, nor that a guardian ad litem was appointed by the court to represent him in those proceedings, nor does the order which it is claimed was drawn and left with the clerk about that time, and which Probate Judge Chrisp signed after he went out of office, set forth the material facts which the Missouri statute says shall be embodied in the decree. It is thus obvious that the claimed adoption proceedings in Arkansas were not in accordance with the Missouri statute. That statute provides, supra, that the adoptive parent or parents shall be capable of inheriting from the adopted child only when the adoption proceedings are in accordance therewith. The War Risk Insurance Act

makes the insurance payable to the person or persons within the permitted class of beneficiaries when, and only when such person would be entitled to the personal property of the deceased under the laws of the State of his residence.

Accepting then, on this point, the nunc pro tunc order as having been made in full compliance with the Arkansas statute and the principles of law applicable to such orders in that State, it seems clear to us that under the Act of Congress and the law of the domicile of the deceased the plaintiffs in error were not entitled to recover.

For the reasons stated the judgment is affirmed.